**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA T.,[1] | ) | |
| | ) | No. 19 CV 614 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | May 28, 2020 |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Patricia T. seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") based on her claim that she is disabled by a combination of lupus, headaches, back and joint pain, carpal tunnel syndrome ("CTS"), anxiety, and depression. Before the court are the parties' cross motions for summary judgment. For the following reasons, Patricia's motion is denied, and the government's is granted:

**Background**

Patricia filed her DIB and SSI applications in August 2014, alleging a disability onset date of February 26, 2014. (Administrative Record ("A.R.") 16.) After her applications were denied initially and upon reconsideration, (id. at 113-14, 151-52), Patricia was granted a hearing before an administrative law judge ("ALJ"), (id. at 37-80). Following her appearance at the September 2017 hearing, the ALJ

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only Plaintiff's first name and last initial in this opinion to protect her privacy to the extent possible.

issued a decision finding that Patricia is not disabled. (Id. at 16-27.) After the Appeals Council declined Patricia's request for review—making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019)—Patricia filed this lawsuit seeking judicial review. The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 5).

## Facts

In the years leading up to her alleged disability onset date, Patricia received treatment for attention deficit and hyperactivity disorder ("ADHD"), depression, headaches, and neck pain, while working at varying times as a nail technician and as a salesperson at a cell phone store and a furniture store. She stopped working in February 2014. Patricia claims that she stopped working because her migraines, joint pain in her hands, back pain, and lupus flareups became disabling. (A.R. 56-59.) At her hearing before the ALJ Patricia presented both documentary and testimonial evidence in support of her applications.

## A. Medical Evidence

Patricia's medical records show that eight days before her alleged disability onset date she sought emergency room treatment because she was worried that she had suffered a stroke after she lost her grip on a cup and dropped it. (A.R. 528, 599.) She reported pain in her right wrist radiating down from her right shoulder and neck, as well as a left-side headache. (Id. at 528.) MRI results were consistent with cervical radiculopathy and showed some cervical disc space narrowing secondary to disc degeneration. (Id. at 530.) An electrodiagnostic test in early

March 2014 showed signs of mild bilateral CTS, slightly more severe on the right side. (Id. at 537.)

In the months that followed, Patricia continued to report pain in her right wrist and at times a tingling sensation in her fingers. (Id. at 576, 583, 640.) She started wearing a wrist brace at night and reported that Aleve provided only minimal relief. (Id. at 808.) In February 2015 Patricia reported that medications helped with her wrist pain somewhat, but both wrists were still tender. (Id. at 732-34.) By that spring she reported that with medication her hand pain had improved. (Id. at 1237.) In December 2015 she reported continued joint pain in her hands and was prescribed prednisone. (Id. at 1267, 1270.) Early in 2016 Patricia fell and broke her right wrist, leading to increased pain. (Id. at 1185.) By April 2016 the injury healed, and her pain was negligible. (Id. at 1637.) But two months later Patricia reported longstanding tingling and numbness in both hands, and a specialist diagnosed her with neuropathy. (Id. at 1623, 1631.) After receiving steroid injections, she still had pain. (Id. at 1287-88.) In February 2017 her specialist recommended either wrist splinting or CTS surgery, (id. at 1615), but there are no records showing that she had the surgery.

Patricia also struggled with back pain and left-side sciatica during the relevant time period. In February 2015 she reported that she had intermittent, moderate to severe low-back pain, but that medication helped. (Id. at 733-34.) In May 2015 the pain in her left leg was severe and became worse with standing and walking. She received an injection of pain medicine. (Id. at 888-89.) The doctor

3

noted that the results of a lumbar spine MRI did not correspond with her complaints. (Id. at 889.) Later in May 2015 Patricia presented with an antalgic gait and again received a pain injection, and this time the medication took her pain from a 10/10 to a 0/10. (Id. at 918, 923.) The relief was temporary, however, and in the summer of 2015, she was assessed with lumbar radiculitis after presenting with low-back and left-side pain and an antalgic gait. (Id. at 928.) She told her doctor that up until February of that year she had walked several miles a day with her dog, but by August she struggled to walk even a few blocks because of her pain. (Id. at 1120.) After a positive straight leg test and an MRI consistent with lumbar radiculopathy, Patricia's doctor prescribed her Gabapentin. (Id. at 1123.) By the fall of 2015 Patricia reported that Gabapentin helped "significantly" with the pain in her back and leg, and that her symptoms had become much more tolerable. (Id. at 1146.) In March 2016 her neurologist wrote that she had achieved good control of her radiculopathy, with "essentially complete resolution of her symptoms," so long as she took her Gabapentin. (Id. at 1189-90.) In 2017 Patricia's doctor described her back pain as "resolved." (Id. at 1564.)

With respect to symptoms related to lupus, in the spring of 2014 Patricia went to an urgent care facility for treatment of a rash on her eyelids and elbow, reporting that she had experienced intermittent itchiness for almost a year. (Id. at 560-61, 569-70.) After the rash continued to recur despite treatment with steroids, Patricia's doctor biopsied the rash in the summer of 2014. (Id. at 576, 578.) The results were consistent with lupus or dermatomyositis. (Id. at 578.) Patricia

consulted with rheumatologist Dr. Sirene Francis, who at first believed the rash was a sign of dermatomyositis. (Id. at 587.) When the rash persisted through the spring of 2015 despite treatment, Patricia's doctor performed another biopsy, prescribed hydroxychloroquine, and wrote that Patricia may need to try methotrexate if the rash persisted. (Id. at 860, 1378.) Patricia followed up with Dr. Francis in May 2015. Dr. Francis's impression was that Patricia was developing lupus and that the rash should be treated with methotrexate. (Id. at 1243.)

At that same appointment, Patricia asked Dr. Francis to complete her disability paperwork. Dr. Francis noted that the main reason Patricia could not work is pain from left-sided sciatica. (Id. at 1237.) She filled out a lupus residual functional capacity ("RFC") questionnaire in which she wrote that Patricia has lifelong lupus with intermittent flareups involving severe fatigue, fever, anxiety, numbness, and tingling in her left arm and left foot. Dr. Francis also reported that Patricia experiences malaise, impaired concentration, cognitive impairment, and frequent, severe headaches, along with left-sided leg and hand pain. (Id. at 907.) Dr. Francis noted that Patricia's concentration is seldom affected by fatigue and pain, but that she has a marked limitation in dealing with work stress. (Id.) She opined that Patricia is unable to work full time but clarified that "I still think it's her back that is contributing more to her inability to work." (Id. at 908.)

At a follow-up appointment less than two months after she completed the RFC form, Dr. Francis wrote that Patricia's lupus was better on methotrexate, (id.

at 1252), and her general physician wrote that her rash was much improved, (id. at 1386). In the months that followed, Patricia's doctors continued to note that her rash improved and she was stable with medication, or even resolved, although she sometimes had mild flareups. (Id. at 1421, 1431, 1449, 1451.) Even after her doctor reduced her methotrexate dose, her rheumatologist wrote in 2016 that she was doing "very well" with no return of symptoms. (Id. at 1279, 1288.) By December 2016 Patricia was off methotrexate and still doing well. (Id. at 1299.) Throughout 2017 her doctors characterized her rash as being "resolved." (Id. at 1313, 1534, 1553, 1564.)

With respect to her headaches and neck pain, Patricia received physical therapy for these problems before and after her disability onset date. Weather and stress increased her headaches, for which she was prescribed Fioricet and Neurontin. Despite these treatments, Patricia continued to complain of headaches in 2014, especially with changes in the weather, although she reported that her medication allowed her to function. (Id. at 640, 642, 644, 646, 648, 662, 664.) In December 2014 Patricia reported to her physical therapist that a headache she was experiencing was down to 2/10 on the pain scale. (Id. at 1002, 1004.) In the spring of 2015 Patricia presented at an emergency room with a headache and back pain and received a Norco prescription after one of her medications had run out. (Id. at 937-42.) By November 2015 Patricia was able to reduce her headache medication because her headaches were better, with only about two severe headaches a month. (Id. at 1146.) Early in 2016 Patricia fell and suffered a concussion, after which she

experienced daily headaches, (id. at 1185, 1187), but by the fall of 2016 she reported to her neurologist that she was not having headaches, (id. at 1288, 1291, 1298). Her rheumatologist reported that in April 2017 Patricia was negative for headaches. (Id. at 1313.)

Patricia also was diagnosed with and took medications for depression, anxiety, and ADHD during the relevant time period, although there are no records showing treatment with a psychologist or psychiatrist. Less than a month after her alleged disability onset date Patricia denied to her doctor that she had concentration problems, memory loss, anxiety, or depression, and the doctor noted that she exhibited normal mood and affect as well as normal attention span and concentration. (Id. at 464.) Patricia ran out of her medications in June 2014, but her doctor noted that her mood nevertheless was stable, with no signs of depression or anxiety. (Id. at 455-57.) That fall her doctors noted that she had no symptoms of depression or anxiety. (Id. at 444-46, 594-95.) In August 2015 her neurologist noted that she was experiencing anxiety and insomnia, but that her concentration, attention, and memory were all normal. (Id. at 1122.) In the following months Patricia's doctors characterized her depression and anxiety varyingly as stable, normal, and negative. (Id. at 1283, 1293, 1302, 1447.) Her doctors also repeatedly characterized her ADHD as "chronic" but "stable." (Id. at 1526, 1543, 1585.)

The medical record includes RFC opinions from two consulting physicians and a report from an examining psychologist. At her February 2015 consultation with the examining psychologist, Patricia presented as cooperative, clear, and

coherent, although her responses were often vague and not always logical and sequential. (Id. at 669-70.) The psychologist administered tests and determined that Patricia's memory and attention were largely intact, and that Patricia meets the criteria for major depressive disorder but noted that this diagnosis was only "by history." (Id. at 670-71.) After reviewing the medical file, a consulting physician opined that same month that Patricia can perform light work despite some moderate limitations in concentration, persistence, or pace. (Id. at 87, 91, 95.) Later in 2015 a second consulting physician opined that Patricia has the RFC for medium work with some moderate limitations in concentration, persistence, or pace and activities of daily living. (Id. at 123, 127-28, 130.)

**B.    Patricia's Hearing Testimony**

At her September 2017 hearing before the ALJ, Patricia described her history of working as a nail technician and salesperson and testified that she is no longer able to perform any work because of her pain and symptoms related to lupus. (A.R. 47-51, 56.) Patricia testified that her lupus flareups are debilitating and last for two to three weeks at a time. (Id. at 56.) She testified that during these flareups she is unable to do anything except lie down. (Id. at 65.) Patricia also said that her migraines can last for two to three days at a time and occur four to five times a month, meaning that she suffers from debilitating migraines for half of every month, and that during these periods she is extremely sensitive to light and sound. (Id. at 58-59.) She said that in addition to migraines she has constant, daily non-migraine headaches. (Id. at 60.) Patricia also said that her hands are stiff in

the morning and that her back and neck pain make it difficult for her to sit or walk for long periods.  (Id. at 57.)

## C.    The ALJ's Decision

The ALJ followed the standard five-step sequence in evaluating Patricia's claims for DIB and SSI.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  At step one the ALJ found that Patricia had not engaged in substantial gainful activity since her alleged disability onset date.  (A.R. 19.)  At step two the ALJ determined that she has severe physical impairments in the form of lupus, asthma, degenerative disc disease of the cervical spine, migraines, bilateral CTS, and lumbar spondylosis with radiculitis and left piriformis syndrome, but no severe mental impairments.  (Id.)  At step three the ALJ found that none of Patricia's impairments meets or equals any listed impairment.  (Id. at 21.)  Before turning to step four the ALJ determined that given the combination of her severe and non-severe impairments, Patricia has the RFC for light work with additional postural and environmental limitations, as well as a limitation to frequent handling, fingering, and feeling.  (Id.)  Based on that RFC assessment, the ALJ determined at step four that Patricia can perform her past work as a furniture salesperson and salesclerk.  (Id. at 26.)  Accordingly, the ALJ concluded that Patricia is not disabled.  (Id. at 27.)

## Analysis

Patricia raises several challenges to the ALJ's decision. She argues that the RFC is flawed because the ALJ failed to consider the impact of her impairments as a combined whole and failed to include non-exertional limitations to accommodate her mental impairments. Patricia also argues that the ALJ committed reversible error in evaluating her symptom statements and in weighing both the consulting physicians' and Dr. Francis's opinions. This court reviews the ALJ's decision only to ensure that she applied the correct legal standards and that the decision is supported by substantial evidence, meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a decision.'" *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). In performing that function the court may not reweigh the evidence and must affirm a well-supported decision even if reasonable minds could disagree as to whether the claimant is disabled. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

### A.   Symptom Assessment

The court begins its analysis with Patricia's challenge to the ALJ's evaluation of her statements regarding her symptoms, because that assessment informs several aspects of the ALJ's decision, including the RFC analysis. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (noting that an erroneous credibility determination requires remand unless the remainder of the ALJ's decision does not depend on it). According to Patricia, the ALJ's determination that she overstated

the severity of her symptoms is insufficiently explained and rests on an inaccurate characterization of the medical record. ALJs are tasked with weighing several factors in evaluating a claimant's pain and other symptoms, including the claimant's daily activities, the effectiveness and side effects of medication, other treatments, and precipitating and aggravating elements. *See* 20 C.F.R. § 404.1529(c)(3). This court gives "special deference" to the ALJ's evaluation of a claimant's symptoms and will overturn the symptom assessment only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (quotation and citation omitted).

In challenging the ALJ's handling of her symptom description Patricia first argues that the ALJ did not sufficiently explain why she rejected her testimony about the severity of her migraines and other headaches. (R. 10, Pl.'s Mem. at 13.) But the ALJ explained that she found Patricia's testimony to be unsupported by the objective record to the extent that she asserted that she was debilitated by migraines for up to half of each month. (A.R. 22.) Contrary to Patricia's assertion, the ALJ built a logical bridge between the record and that conclusion by pointing to evidence that Patricia's headaches improved with physical therapy and were stable with medication. (Id.) The ALJ cited records showing that in November 2015 Patricia reported that her medication was controlling her headaches and she had only had two severe headaches that month, and then denied headaches in 2016 and 2017. (Id. at 23.) In other words, the ALJ based her conclusion that Patricia's headaches are not as debilitating as she claims on objective evidence coupled with

Patricia's own past statements and explained the mismatch between that evidence and Patricia's hearing testimony. Accordingly, this aspect of the symptom assessment is not patently wrong. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Next Patricia argues that the ALJ erroneously discounted the impact of her lupus symptoms after concluding that her treatment for that condition was both conservative and focused on her skin issues, which largely resolved with treatment. According to Patricia, that conclusion represents a misunderstanding of the debilitating nature of her rashes despite helpful treatment. (R. 10, Pl.'s Mem. at 13.) Patricia's argument overlooks the fact that the ALJ primarily discounted her testimony on this point because she said that her flareups last for two to three weeks every month, but she never reported that to her doctors. (A.R. 23.) In her submission Patricia does not point to any evidence undercutting that finding. Moreover, the ALJ correctly noted that after her rheumatologist finally diagnosed Patricia with lupus in May 2015 and started her on methotrexate, her rashes and joint pain improved, and by 2016 and 2017 she was stable even without taking the medication. (Id.) The ALJ is entitled to consider the effectiveness of medication in weighing a claimant's testimony, 20 C.F.R. § 404.1529(c)(3), and here the ALJ properly relied on the evidence documenting the effective treatment of Patricia's rashes to conclude that her lupus symptoms are less severe than she claims.

Patricia next argues that the ALJ erroneously discounted her severe back pain by overlooking objective evidence including MRI results, positive straight leg

tests, and evidence of her limited range of motion and unsuccessful pain injections. (R. 10, Pl.'s Mem. at 13-14.) The ALJ did not overlook this evidence. She acknowledged that the objective evidence showed degenerative disc changes, that Patricia had an antalgic gait at one point, and that she received pain injections. (A.R. 24.) But as the government points out, the evidence on which Patricia relies in support of her argument predates August 2015, when she started taking Gabapentin. (R. 16, Govt.'s Mem. at 10.) The record supports the ALJ's observation that Gabapentin controlled Patricia's back pain and that after she began taking that medication, she had a normal gait and full strength. (A.R. 1190.) In fact, records characterize her back pain as being resolved. (Id. at 1564, 1578, 1190.) Again, because the ALJ is entitled to discount pain complaints where the record shows that treatment mitigates its severity and because the record supports the ALJ's finding here, Patricia has not shown that the ALJ was patently wrong in discounting her back-pain testimony.

Patricia's final argument with respect to the symptom assessment is that the ALJ falsely characterized the records regarding her CTS to justify discounting her wrist pain testimony. (R. 10, Pl.'s Mem. at 14-15.) The ALJ concluded that Patricia can engage in frequent handling despite her CTS symptoms because the evidence showed that in September 2016 pain injections resolved her symptoms and even though her doctor recommended surgery, that recommendation followed a wrist fracture and came at a time when Patricia exhibited no problems with grip strength. (A.R. 25.) The ALJ also explicitly found that Patricia's reports that she

writes in a journal daily and can cook undercut her CTS allegations. (Id. at 25-26.) Patricia disagrees that daily journaling is consistent with frequent handling, but the court's role is not to reweigh the meaning of the evidence. *See Burmester*, 920 F.3d at 510. The governing regulations explicitly authorize the ALJ to rely on a claimant's daily activities to discount her symptom allegations. *See* 20 C.F.R. § 404.1529(c)(3). Even if the ALJ could have explored the evidence regarding Patricia's CTS in more detail, the reasons she provided are supported by the record and therefore not patently wrong. For these reasons, Patricia has not shown that the ALJ erred in evaluating her symptom description.

## B. Combination of Impairments

Patricia argues that the ALJ's RFC assessment is erroneous because the ALJ did not consider the combined impact her impairments have on her ability to function. She asserts that assigning a limitation to light work to accommodate her lupus symptoms fails to account for how her flareups render her unable to function because they cause a combination of visual disturbances, fatigue, rashes that make it difficult to open her eyes, and joint pain. (R. 10, Pl.'s Mem. at 8-9.) But the evidence Patricia points to for support is her own hearing testimony. (Id. at 9.) As described above, the ALJ gave supported reasons for discounting that testimony and reasonably concluded based on the longitudinal record that Patricia's pain and rashes are well-controlled with medication. Moreover, the ALJ wrote that she had considered the impairments in combination, (A.R. 21), and Patricia has not

explained what limitations should have been but were not included in the RFC to account for her symptoms' combined impact.

As for Patricia's argument that the limitations to frequent handling and six hours of standing and walking each day are insufficient to account for her CTS symptoms and back pain, the ALJ pointed to substantial evidence to explain these limitations. As to her conclusion that Patricia can engage in frequent handling, the ALJ explained that Patricia reported only intermittent tingling and at one point described her CTS-related pain as "negligible," doctors' examinations showed normal grip strength and sensation and full range of motion, and pain injections provided relief. (Id. at 25.) The ALJ also pointed to a wide range of evidence to support her conclusion that Patricia's back and leg problems are consistent with light work. Specifically, the ALJ noted evidence showing that Gabapentin resolved Patricia's pain and that, after she began taking this medication, she exhibited a normal gait and normal strength. (Id. at 24-25.) The ALJ further noted that MRI evidence showed only mild degenerative changes, and that Patricia herself reported walking her dog for miles after her disability onset date. (Id.) Patricia's argument here rests on a disagreement with how the ALJ weighed this evidence, but it is not this court's role to substitute its judgment for that of the ALJ. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Because the ALJ adequately explained the RFC limitations she assigned, the court concludes that her RFC is supported by substantial evidence.

## C.    Non-Exertional Limitations

Patricia presents multiple arguments in support of her assertion that the ALJ erred in failing to include in the RFC assessment non-exertional limitations relating to her depression, anxiety, or ADHD.  First, she argues that the ALJ impermissibly concluded that Patricia can perform the skilled or semi-skilled work of a salesperson because she emails her doctors, attends appointments alone, and interacts appropriately with doctors.  (R. 10, Pl.'s Mem. at 10.)  But the ALJ's statement has to be read in the context of the opinion as a whole, *see Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), and at step two the ALJ provided an in-depth explanation of why she found Patricia's concentration and social interaction limitations to be only mild.  For example, she noted that testing showed that Patricia has no memory or attention impairments, she has intact judgment, and that medication controls her ADHD symptoms.  (A.R. 21.)  She also noted in the RFC discussion that Patricia writes daily.  (Id. at 25-26.)  Patricia points to no opinion or other evidence to show that she is incapable of semiskilled or skilled work.

Patricia next argues that the ALJ "blatantly misled the reader" when she wrote that "[w]hile depression and anxiety are listed as diagnoses, the specialists' records consistently state she is not depressed or anxious and she did not mention mental impairments to them."  (Id. at 19.)  According to Patricia, the ALJ implies that Patricia did not mention mental health problems to mental health specialists, when the specialists mentioned are rheumatologists and neurologists.  (R. 10, Pl.'s

Mem. at 10.)  But the ALJ mentioned in the very same paragraph that Patricia never saw a psychologist or psychiatrist, and in the next paragraph noted that her general practitioner prescribed her depression and anxiety medications, so it is unclear in what way that statement could be misleading when read in context. (A.R. 19.)  Further, to the extent Patricia argues that her diagnoses of depression and anxiety demonstrate that she has non-exertional limitations, (see R. 10, Pl.'s Mem. at 10), a diagnosis is insufficient to show that a limitation is severe, especially where, as here, the record amply supports the conclusion that her depression and anxiety are controlled with medication, *see Richards v. Berryhill*, 743 Fed. Appx. 26, 30 (7th Cir. 2018) (noting that pointing to diagnoses is insufficient to establish functional limitations).

Next Patricia argues that the ALJ erred in finding that she has only mild limitations in the "Paragraph B" criteria at step two, describing that conclusion as "untenable." (R. 10, Pl.'s Mem. at 11.)  With respect to the ALJ's finding of only mild limitations in understanding, remembering, or applying information, Patricia asserts that this finding "makes no sense" because the consulting psychologist who examined her noted that she has tangential thoughts and gave some vague, illogical, and off-sequence responses during their interview. (Id.)  But the ALJ did not overlook those references.  She addressed them and found that considering the consulting psychologist's conclusion that Patricia's memory was intact, and more recent records from her neurologist confirming that she has no memory impairment, any impairment in this criterion was no more than mild.  (A.R. 20.)  The record is in

fact full of notes confirming that Patricia is oriented and has an intact memory, (see, e.g., id. at 670, 1122), and Patricia denied having memory problems to her doctor, (id. at 464). Patricia also challenges the ALJ's assessment that she has only mild limitations in social interactions because she disagrees with the ALJ that her ability to live with family, maintain friendships, and interact with doctors without problems supports that finding. But she points to no evidence to support her suggestion that she has greater limitations in this area, and again, her disagreement with how the ALJ weighed the evidence is insufficient to show reversible error. *See Burmester*, 920 F.3d at 510.

With respect to the ALJ's conclusion that Patricia's deficits in the area of concentration, persistence, or pace are only mild, Patricia argues that the ALJ failed to account for how her lupus flareups and pain would interfere with her concentration. (R. 10, Pl.'s Mem. at 11.) But the ALJ reasonably explained her finding that Patricia's concentration limits are mild by pointing to evidence that her attention was intact on examination, medication controls her ADHD, and she meditates and writes. (A.R. 20.) Later in the decision the ALJ fully explained her determination that Patricia's pain and lupus flareups are not as severe as she asserts and are well-controlled with medication. (Id. at 23-24.) The ALJ also points out that Patricia denied mental health symptoms throughout the record, (id. at 26), and that observation is supported by treatment notes, (see id. at 464, 1122). Reading the decision as a whole, *see Rice*, 384 F.3d at 370 n.5, the court concludes

that the ALJ's assessment of Patricia's concentration limitations is supported by substantial evidence.

Finally, Patricia argues that the ALJ was overly dismissive of the evidence that she experiences visual auras associated with migraines. Patricia argues that the ALJ should have factored in how these visual auras would have impacted her return to work, regardless of their cause. (R. 10, Pl.'s Mem. at 12.) But the ALJ addressed the evidence of visual auras and reasonably concluded that they have no impact on her ability to work. At step two she noted that there was no evidence that her visual disturbances lasted for 12 months, there was no follow up on this condition, and Patricia did not mention them at the hearing. (A.R. 20-21.) These observations sufficiently support the ALJ's decision to exclude from the RFC any limitations related to her 2016 complaints of visual auras.

## D.   Medical Opinions

Lastly, Patricia challenges the ALJ's handling of the medical opinions in the record. She first argues that the ALJ erred in giving "little weight" to Dr. Francis's opinion that her symptoms are disabling, arguing that the opinion is entitled to controlling weight and that the ALJ misapplied governing regulatory factors and misconstrued the basis of Dr. Francis's opinion. (R. 10, Pl.'s Mem. at 15.) A treating physician's opinion is entitled to controlling weight only where it is well-supported and uncontradicted by other substantial evidence in the record. *See* 20

C.F.R. § 404.1527; *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).[2]  Where a treating physician's opinion does not meet the standard for controlling weight, "that opinion should be weighed based on the nature and extent of the treatment, the treating source's area of specialty, and the degree to which the opinion is consistent with the record and supported by other evidence." *Gebauer v. Saul*, 801 Fed. Appx. 404, 409 (7th Cir. 2020); 20 C.F.R. § 404.1527(c)(2).  An ALJ's evaluation of a treating physician's opinion must stand so long as she minimally articulates the reasons underlying that assessment. *Henke v. Astrue*, 498 Fed. Appx. 636, 639 (7th Cir. 2012).

Here the ALJ engaged with relevant factors in explaining her decision to give little weight to Dr. Francis's opinion that Patricia's symptoms are of disabling severity.  Specifically, the ALJ noted that Dr. Francis is a rheumatologist who gave her opinion in May 2015, at the same time she first diagnosed Patricia as having lupus.  The ALJ pointed out that Dr. Francis was careful to note that the source of Patricia's disabling impairments was not lupus (the condition for which Dr. Francis is a specialist), but rather back and leg pain.  (A.R. 26.)  The ALJ noted that Dr. Francis's opinion is undercut by subsequent evidence showing that Patricia's back pain resolved in the months and years following that opinion.  (Id.)  Because the ALJ weighed Dr. Francis's opinion in light of her specialty and the extent of the

---

[2] On January 18, 2017, new regulations issued eliminating the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  The new rules apply only to claims filed after March 27, 2017.  Patricia filed her DIB and SSI applications in August 2014.  (A.R. 16.)  Thus, the prior rules in 20 C.F.R. § 404.1527 govern this matter.

conflict between that opinion and the longitudinal record, her decision to afford it little weight is sufficiently articulated and supported by substantial evidence. *See Gebauer*, 801 Fed. Appx. at 409-10.

Patricia's challenge to the ALJ's treatment of the state agency consulting psychologists' opinions rests on her assertion that she assigned them weight "according to whether she agreed with them." (R. 10, Pl.'s Mem. at 15.) Again, contrary to Patricia's assertions, the ALJ sufficiently articulated why she gave these two opinions little weight. Specifically, the ALJ wrote that she found the consulting psychologists' opinions that Patricia has severe mental impairments unsupported because Patricia did "not receive formal mental health treatment, denies symptoms throughout the record, her mental status exams do not show deficits and she notes her symptoms are controlled with medications." (A.R. 26.) Read together with her detailed explanation at step two as to why she did not find Patricia's mental impairments to be severe, (see pages 16-19, *supra*), these reasons provide sufficient support for the ALJ's treatment of the consulting psychologists' opinions.

## Conclusion

For the foregoing reasons, Patricia's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

ENTER:

_____
Young B. Kim
United States Magistrate Judge

21